**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 09-cv-01364-PAB-BNB

DILLON COMPANIES, INC., d/b/a KING SOOPERS, INC.,

    Plaintiff,

v.

UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL NO. 7; ALL THOSE ACTING IN CONCERT WITH LOCAL NO. 7; and DOES 1-_____

    Defendants.

**PRELIMINARY INJUNCTION**

**Blackburn, J.**

This matter is before me on the plaintiff's **Motion for Temporary Restraining Order and Preliminary and Permanent Injunction** [#3][1] filed June 11, 2009. I deny the motion for a temporary restraining order as moot. I deny the plaintiff's request for a permanent injunction because the prerequisites to the entry of such relief have not been satisfied. I grant the motion preliminary injunction in part and deny it in part.

**I.  BACKGROUND**

On June 12, 2009, I issued a **Scheduling Order** [#6] directing the defendants to file responses to the plaintiff's motion on or before Tuesday, June 16, 2009, and directing the plaintiff to file a reply on or before Wednesday, June 17, 2009. Defendant United Food and Commercial Workers Union Local No. 7 (Local 7) filed a timely response, and the plaintiff, Dillon Companies, Inc. d/b/a King Soopers, Inc. (King Soopers) filed a timely reply. I conducted a hearing on the plaintiff's motion on Thursday, June 18, 2009. The

---

[1] "[#3]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF). I use this convention throughout this order.

parties presented evidence and argument.

King Soopers operates a chain of grocery stores with many outlets in the Denver metropolitan area. Local 7 represents King Soopers' employees under the terms of two collective bargaining agreements (CBA). The relevant CBAs have expired, and the parties are engaged in efforts to negotiate the terms of new CBAs. No strike or lock out has been implemented, and King Soopers employees who are represented by Local 7 continue to work in King Soopers stores.

King Soopers alleges that agents of Local 7 recently have engaged repeatedly in a practice known as "blitzing." According to King Soopers, blitzing

> refers to a group of people dressed in black t shirts with Local 7 lettering who enter stores and begin speaking on the sales floor to store employees or customers about the situation, and passing out fliers, disrupting their ability to work or shop, as the case may be. These incidents take place randomly and last for varying lengths of time. These black t shirt groups also go into non-public areas, like the back room of the store.

*Motion for preliminary injunction*, Exhibit 1 (Bouknight affidavit), ¶ 3. In its present motion, King Soopers seeks an order prohibiting Local 7 representatives from engaging in blitzing and a variety of other activities. In response, Local 7 argues that this court does not have jurisdiction over this matter and that, if the court does have jurisdiction, King Soopers is not entitled to a temporary restraining order or preliminary injunction.

## II.  JURISDICTION

**Norris-LaGuardia Act** - 29 U.S.C. § 104, part of the Norris-LaGuardia Act, limits the jurisdiction of federal courts in cases arising from labor disputes. Local 7 argues that this court is deprived of jurisdiction over this case under § 104 (e), (g), and (I), which provide:

> No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing

>out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:
>
>\* \* \* \*
>
>(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;
>
>\* \* \* \*
>
>(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;
>
>\* \* \* \*
>
>(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title.

**LMRA** - 29 U.S.C. § 185(a), part of the Labor Management Relations Act (LMRA), provides

>Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

Considering these two statutes together, the United States Supreme Court has recognized an exception to the anti-injunction provisions of the Norris-LaGuardia Act, 29 U.S.C. § 104, when an employer brings suit under the LMRA, 29 U.S.C. § 185(a), to enforce a union's contractual obligation to arbitrate grievances rather than to strike over them. ***Boys Markets, Inc. v. Retail Clerks Union, Local 770***, 398 U.S. 235 (1970). The Supreme Court refined the holding in ***Boys Markets*** in ***Buffalo Forge Co. v. United Steelworkers of America***, 428 U.S. 397 (1976). In ***Buffalo Forge***, the Court held that the holding in ***Boys Markets*** applies "only to those situations in which the labor dispute precipitating the strike is subject to arbitration. The Court emphasized that

the rationale underlying **Boys Markets** was to protect the arbitral process from being frustrated and to ensure that the parties honored their bargains." The Court in **Boys Markets** concluded that

> the unavailability of equitable relief in the arbitration context presents a serious impediment to the congressional policy favoring the voluntary establishment of a mechanism for the peaceful resolution of labor disputes, that the core purpose of the Norris-LaGuardia Act is not sacrificed by the limited use of equitable remedies to further this important policy, and consequently that the Norris-LaGuardia Act does not bar the granting of injunctive relief in the circumstances of the instant case.

**Boys Markets**, 398 U.S. at 253.

In **Oil, Chemical and Atomic Workers International Union, AFL-CIO, Local 2-286 v. Amoco Oil Company**, 885 F.2d 697 (1989), the United States Court of Appeals for the Tenth Circuit analyzed the holdings in **Boys Markets** and **Buffalo Forge** in the context of a challenge to the jurisdiction of the federal courts. In **Amoco**, the Tenth Circuit held "that **Boys Markets** injunctions are available to enjoin employer breaches of collective bargaining agreements which threaten the arbitral process." 885 F.2d at 702. "The peaceful resolution of labor disputes through voluntary arbitration constitutes the overarching concern of national labor policy." **Amoco**, 885 F.2d at 701.

In the present case, both King Soopers and Local 7 claim that the other has violated the visitation provision of the relevant CBAs[2]. The visitation provisions describe the terms on which a representative of Local 7 may contact King Soopers employees who are members of the union by entering the premises of the employer, King Soopers. Under the terms of the CBAs, a claim that a party to a CBA has breached the terms of a

---

[2] Although the relevant CBAs now are expired, the parties' papers and presentations at the June 18, 2009, hearing indicated without exception that all parties continue to rely on and operate under the provisions of the relevant CBAs. I assume, without deciding, that the provisions of the CBAs remain in effect.

CBA is subject to binding arbitration under arbitration procedures defined by the CBA. Local 7 has filed numerous grievances in which it claims that King Soopers has violated the visitation provisions of the CBAs by unduly limiting the terms on which a Local 7 representative may visit King Soopers stores to interview King Soopers employees. According to testimony presented at the June 17, 2009, hearing, some of the currently pending grievances concern blitzing incidents at King Soopers stores. Other pending grievances concern disputes about the scope of the visitation provisions of the CBAs, but do not specifically concern blitzing incidents. All of the pending grievances are subject to arbitration under the terms of the CBAs.

Applying the principles established in **Boys Markets**, **Buffalo Forge**, and **Amoco**, I conclude that I have jurisdiction over this case. King Soopers alleges that Local 7 has violated the visitation provisions of the relevant CBAs by engaging in blitzing at King Soopers stores. King Soopers asks that I enjoin this practice. The parties' dispute over the scope of the visitation provisions is the subject of many grievances filed by the union. Some of those grievances concern blitzing, and those grievances are the subject of arbitration proceedings under the CBAs. The issue raised by King Soopers' present motion is whether Local 7's alleged breaches of the visitation provisions of the CBAs should be enjoined to protect the arbitral process in which those alleged breaches will be addressed. This is precisely the circumstance in which a federal court properly may exercise jurisdiction to protect the overarching concern of "peaceful resolution of labor disputes through voluntary arbitration" and to enjoin "breaches of collective bargaining agreements which threaten the arbitral process." **Amoco**, 885 F.2d at 701, 702.

## III. FACTS

The visitation provisions of the two CBAs are similar but not identical. *Bouknight testimony*[3]. The CBA covering Denver area clerks provides that the

> President of the Union, or the Business Representative thereof, shall have the right of entering the premises of the Employer for the purpose of interviewing employees in such a way as to not interfere with the service of the Employer.

*Motion for preliminary injunction*, Exhibit 1 (Bouknight affidavit), ¶ 5, n. 1. The other CBA, which concerns employees in the meat department and a few other departments, differs from this provision because this CBA specifies the chief executive officer of the union, the deputy secretary of the union, and the union representative as the union officials covered by the visitation provision. *Bouknight testimony.* Testimony presented by both members of King Soopers management and by Local 7 representatives indicated that the union officials who visit King Soopers stores routinely generally are referred to as "union representatives." The testimony indicated also that when a union representative visits a store, he or she generally alerts the store manager of his or her visit and then walks around inside the store to alert the employees, who are members of the union, to the presence of the union representative.

The portions of the store in which customers do their shopping are referred to as the "sales floor." In general, when a union representative walks the sales floor to alert employees to his or her presence, the union representative sometimes will engage employees in brief conversation. If an employee indicates to the union representative that the employee has some business to discuss with the union representative, then the

---

[3] A formal transcript of the June 18, 2009, hearing has not been prepared and I cannot properly cite to the transcript by page and line number. Therefore, when I refer to testimony given at that hearing, I simply will cite the witness's name.

union representative generally will arrange to meet the employee in the store's break room or in some other place away from the sales floor for further discussion.  On some occasions, the union representative will arrange to discuss the issue with the employee at a different place and time.  There was some testimony by union representatives that indicated that discussions with employees on the sales floor sometimes include a discussion of union business and sometimes are more than very brief discussions.  In recent months, according the Local 7s witnesses, the managers of some King Soopers stores have insisted that union representatives confine their discussions with employees to the store's break room or to a smoking area outside of the store.  These limitations are the subject of some of the grievances filed by Local 7.

According to testimony presented by King Soopers witnesses, about eleven blitzing incidents occurred in King Soopers' stores between May 27, 2009 and June 6, 2009.  *Motion for temporary restraining order and  preliminary injunction*, Exhibit 1 (affidavits of Stephanie Bouknight, Anna Martinez, Nancy Johnson, Bob Jajdelksi, and Paul Mondragon); *Testimony of Stephanie Bouknight, Anna Martinez, Nancy Johnson, Bob Jajdelksi, and Mitchell Carpenter.*  All of the affidavits referenced above are part of Exhibit 1.  I summarize briefly the description of a few of the blitzing incidents described by these witnesses.

**Anna Martinez** - Anna Martinez is the manager of a King Soopers store. Martinez said that on June 3, 2009,

> a gang of approximately 11 people marched into the facility together just after noon. * * * It was obvious they were acting under the direction of Local No. 7 of the United Food and Commercial Workers Union ("Local 7"), because they were wearing identical black t shirts with Local 7 branding.  Just the appearance of such a large hostile gang, wearing black clothing, was itself disturbing.

> They confronted me in the front of the store, in front of customers and other employees. One of them said he was going to fight me. * * * One yelled that I was an abusive manager to my employees.

*Motion for temporary restraining order and preliminary injunction*, Exhibit 1 (Martinez affidavit). Martinez says she told this group not to talk to employees on the sales floor, an instruction she says was consistent with prior practice with union representatives. Martinez said the

> gang then began disrupting other employees at the store, speaking to them, or shouting at them, while the employees were trying to do their jobs. The gang was roaming around different areas of the store, including non-public areas, interrogating or shouting at employees. They were talking about contract negotiations between Local 7 and King Soopers, and shouting that the employees had to make King Soopers suffer. It was very disruptive and interfered with normal store production.

*Motion for temporary restraining order and preliminary injunction*, Exhibit 1 (Martinez affidavit). Martinez described two similar visits to her store by groups wearing black Local 7 t-shirts on the following day, June 4, 2009. She stated that these visits also disrupted store operations. *Id*; *see also Martinez testimony*.

**Bob Jajdelski** - Bob Jajdelski is an assistant manager at a King Soopers store. Jajdelski described a dispute he had with a union representative who visited his store on May 27, 2009. Jajdelski insisted that the union representative meet with employees in the lounge or the break area, and the union representative insisted on speaking to employees on the sales floor. Jajdelski called the police, who told the representative that he had to leave unless he complied with Jajdelski's instructions. The union representative left.

The following day, May 28, 2009, about ten people wearing black Local 7 t-shirts appeared in the store where Jajdelski works. Jajdelski told the group that it must leave unless they were willing to speak to employees in the lounge or outside. They claimed

-8-

they had a right to be in the store under the CBAs, and Jajdelski disputed this contention.  One of the people in a Local 7 shirt asked Jajdelksi " did you really think you could kick one of us out of here yesterday and nothing was going to happen?"  At the direction of one member of the group, the group split up into smaller groups, and began to walk around the store.  They spoke to employees and customers and were handing out flyers.  They interrupted the work of employees.  Customers complained to Jajdelski about how members of the group were blocking aisles or access to registers.  The group left the store after about 30 minutes.  *Motion for temporary restraining order and  preliminary injunction*, Exhibit 1 (Jajdelski affidavit); *see also Jajdelski testimony*.

**Nancy Johnson** - Nancy Johnson is the manger of a King Soopers store.  On June 3, 2009, a group of about nine people came into her store.  Everyone in the group was wearing a black t-shirt with Local 7 branding.  Johnson saw one or two members of the Local 7 group speaking to pharmacy employees about contract issues.  The pharmacy employees had stopped work to talk to the two members of the Local 7 group.  Johnson asked these two people to meet with employees in the lounge but the people in the Local 7 shirts refused to do so.  Four or five pharmacy customers were standing in line during these events.

Later, Johnson saw two people in Local 7 shirts blocking aisle four or aisle five near the front of the store.  They refused to move.  Johnson arranged to have the local police summoned.  When the police arrived, the group in the Local 7 shirts was "hanging out on either side" of the store's front entrance.  Customers complained to Johnson about the actions of the group in the store, and showed her fliers that the people in the Local 7 shirts were handing out to people.  *Motion for temporary restraining order and  preliminary injunction*, Exhibit 1 (Johnson affidavit); *see also*

*Johnson testimony.*

Generally, I find the testimony of the King Soopers witnesses to be credible. The descriptions of the blitzing incidents given by Martinez, Jajdelski, and Johnson generally are consistent with the descriptions of blitzing incidents given by other King Soopers witnesses. The number of people involved in the various blitzing incidents varies, and the actions of the people wearing Local 7 t-shirts varies somewhat among the incidents. However, the blitzing incidents generally involve several people wearing black Local 7 t-shirts entering a King Soopers store at the same time, efforts by those people to talk to store employees about contract negotiations, frequent confrontations with members of management, which have included shouting and threatening statements, efforts to discuss union issues with customers, and sometimes physical obstruction of certain areas of a store. Addressing the blitzing incidents, the King Soopers witnesses agreed that none of these incidents resulted in any physical injury to any person or any damage to tangible property.

Generally, I find the testimony of the Local 7 witnesses to be credible. None of the Local 7 witnesses presented testimony or other evidence indicating that the blitzing incidents described by the King Soopers witnesses did not occur or that the descriptions of those incidents provided by the King Soopers witnesses was inaccurate. Rather, Local 7 presented the testimony of union representatives who described their usual routine when visiting a King Soopers store. Generally, this testimony indicated that only one union representative visits a store on any particular occasion, although at times two representatives have visited a store simultaneously. The testimony indicated that union representatives often visit with store employees on the sales floor to alert employees to the presence of the representative and to determine if any employees have issues to

discuss with the representative. This testimony indicated also that any such discussions on the sales floor generally are brief and discreet. Discussions that may take some time or that may involve sensitive or confidential information usually are deferred to a later time and take place in an area away from the store sales floor.

Finally, it is undisputed that the visitation provisions of the relevant CBAs provide that a union representative has the right to enter a King Soopers store "for the purpose of interviewing employees in such a way as to not interfere with the service of the Employer." It is undisputed that the union has filed grievances challenging King Soopers' interpretation of these provisions in terms of the activities a union representative may undertake when visiting a store. It is also undisputed that the union has filed grievances challenging King Soopers' assertion that the blitzing incidents violated the visitation provisions of the CBAs . These grievances currently are pending under the arbitration provisions of the CBAs.

## IV. ANALYSIS

### A. Temporary Restraining Order & Permanent Injunction

King Soopers seeks, *inter alia*, both a temporary restraining order and a preliminary injunction. Under FED. R. CIV. P. 65(b), a temporary restraining order is essential a stop-gap measure to be imposed when relief is needed urgently but more time is necessary to complete a proper preliminary injunction analysis. This is the reason that the life of a temporary restraining order is limited to ten days. FED. R. CIV. P. 65(b)(2). In this case, the parties have presented a full round of briefing and have presented testimony and other evidence at a hearing. Both parties have been heard and the record is sufficient to permit me to undertake an analysis of King Soopers' request for a preliminary injunction. In these circumstances, there is no need for the

entry of a temporary restraining order, assuming there is an evidentiary basis for such an order. Therefore, I deny King Soopers' motion for a temporary restraining order as moot.

King Soopers seeks also a permanent injunction. Generally, a permanent injunction is appropriate only after the parties have been heard fully at trial or on a motion for summary judgment, and the entry of judgment is appropriate. This case has proceeded only through a preliminary injunction hearing. The entry of a permanent injunction on the present record, which is only preliminary, is not appropriate. Therefore, I deny King Soopers' motion for a permanent injunction without prejudice.

### B.  Preliminary Injunction

In the context of a request for a so-called ***Boys Markets*** injunction, a court may not issue an injunction unless it determines that the ordinary principles of equity support injunctive relief.  ***Oil, Chemical and Atomic Workers International Union, AFL-CIO, Local 2-286 v. Amoco Oil Company***, 885 F.2d 697, 703 (10th Cir.1989).  However, as outlined in ***Amoco***, the applicable analysis differs significantly from the usual analysis of a request for injunctive relief.

To obtain an injunction in a ***Boys Markets*** context, the plaintiff first must show:

1.  That the dispute is subject to mandatory arbitration under the labor contract; and

2.  That the arbitrable dispute is the dispute underlying the lawsuit, rather than a collateral dispute.

***Amoco,*** 885 F.2d at 702.  This analysis is designed to determine if the action to be enjoined is frustrating the arbitral process.  *Id*. at 702 - 703.  Generally, maintaining the status quo in this context is seen as preventing frustration of the arbitral process.  *Id*. at

702. If frustration of the arbitral process is shown, then the plaintiff must show also that the ordinary principles of equity support the issuance of injunctive relief. *Id*. at 703. The frustration of arbitration analysis coincides with the irreparable injury analysis, discussed below. *Id*. at 704.

I find and conclude that the evidence in the record establishes both of these preliminary elements. First, the question of whether or not blitzing is permissible under the visitation clauses of the relevant CBAs is the subject of pending grievances that are subject to binding arbitration under the CBAs. Second, when the issues presented by this case are focused accurately, the same question is presented in this case. Thus, the arbitrable dispute, the question of whether blitzing is permissible under the visitation clauses of the CBAs, also is the dispute underlying this lawsuit. Thus, the dispute presented in this case is not collateral to the dispute presented in arbitration.

With these preliminary issues resolved, I address the usual quadripartite analysis applicable to requests for a preliminary injunction. To obtain a preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. **Attorney General of Oklahoma v. Tyson Foods, Inc**., 565 F.3d 769, 776 (10th Cir. 2009). In the context of a request for a **Boys Markets** injunction, this familiar analysis is altered and focused on the specific issues that arise in this context. I apply the specialized analysis adopted by the Tenth Circuit in **Amoco**, 885 F.2d at 704 - 709.

### 1. Likelihood of Success on the Merits

In **Amoco**, the court held that a plaintiff "need only establish that the position he

will espouse in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor. [There must be] a genuine dispute with respect to an arbitrable issue." *Id*. at 704 (quoting ***Amalgamated Transit Union, Div. 1384 v. Greyhound Lines, Inc.***, 529 F.2d 1073, 1077 - 1078 (9th Cir. 1976)).

Here, King Soopers will respond in arbitration to Local 7's grievances concerning the application of the CBAs visitation provisions to the blitzing incidents. King Sooper's position is that the practice of blitzing violates the visitation clauses of the CBAs because blitzing interferes with the service provided by King Soopers. Again, the visitation clauses provide that union representatives may visit King Soopers stores "for the purpose of interviewing employees in such a way as to not interfere with the service of the Employer," King Soopers. The testimony of the King Soopers witnesses indicates credibly that blitzing interferes with the service provided by King Soopers. Considering the evidence presented in this case, I find and conclude that King Soopers' position in the arbitration of Local 7's grievances concerning blitzing presents a genuine dispute with respect to an arbitrable issue.

Applying the standards established in ***Amoco***, I conclude that King Soopers has demonstrated a likelihood of success on the merits.

### 2. Irreparable Injury

Many courts have construed irreparable injury in this context as "an injury that would undermine the integrity of the arbitration process by making an eventual award only an empty victory." ***Amoco***, 885 F.2d at 704. In ***Amoco***, the court emphasized that the irreparable injury inquiry coincides with the frustration of arbitration analysis. *Id*. at 704. That analysis is discussed above.

In ***Amoco***, the union challenged Amoco's proposed drug testing program. The

union asserted that the drug testing program violated the CBA.  The *Amoco* court found that the "stigmatization and humiliation resulting from the drug testing program's invasion of privacy can support findings of irreparable injury because these injuries cannot be redressed by an arbitral award."  *Id*. at 705.  An arbitral award of reinstatement and back-pay, for example, would not make an employee whole.  *Id*. at 707 - 708.  Courts should use a wide focus in assessing the nature of the threatened injury.  *Id*. at 709.

In the present case, King Soopers claims that the repeated blitzing incidents violate the CBAs because they have caused significant disruptions to King Soopers' business at several stores.  Considering the evidence, this contention is credible and reasonable.  The evidence indicates that eleven blitzing incidents occurred in the course of eleven days in the very recent past.  The members of the groups wearing Local 7 shirts during the blitzing incidents often spoke to management, employees, and customers about the ongoing negotiations of new CBAs between King Soopers and Local 7.  Those negotiations continue and, thus, the topics addressed by the blitzers remain acutely relevant to the parties.  That fact, plus some of the statements made by certain individuals involved in the past blitzes, indicates that it is more likely that not that Local 7 will engage in additional blitzing while Local 7 negotiations and arbitration with King Soopers are ongoing.  If an arbitrator ultimately determines that blitzing is a violation of the visitation provisions of the CBAs, then that determination would not make King Soopers whole.  Such a determination likely would prevent blitzing after the arbitrator's decision, but such a determination would not provide any form of relief for the past disruptions of King Soopers' operations by Local 7 blitzers.

I note that it is impossible to measure accurately the harm suffered by King

Soopers as a result of the disruptions it suffers at the hands of Local 7 blitzers. Notably, one reasonably could argue that blitzing probably has an adverse affect on King Soopers customers who witness a blitzing incident, and blitzing may reduce or eliminate purchases by such customers on the day of a blitz and possibly later. This would constitute a loss of good will. However, it is impossible to measure such losses. Further, even if King Soopers' losses could be measured readily, nothing in the record indicates that the arbitration procedures under the CBA can provide relief that addresses or compensates such losses. On the other hand, if blitzing is stopped until the arbitrator can determine whether or not blitzing is permissible under the CBAs, then King Soopers will not suffer harm from blitzing in the interim, and the purpose of the arbitration process, labor peace, will not be compromised or frustrated.

Applying the standards outlined in *Amoco*, I conclude that King Soopers has established the likelihood of irreparable injury.

### 3.  Balance of Hardships

As applied in *Amoco*, the balance of hardships analysis is essentially the same as the balance of hardships analysis in an injunction analysis outside of the labor context. In *Amoco*, the court concluded that the only threatened harm to Amoco was the delay in implementing its proposed drug testing program. No particular problem with drug use at the subject Amoco refinery had been demonstrated, so delay in implementation did not present a risk of specific harm to Amoco's operation. On the other hand, the irreparable injury to employees – stigmatization, humiliation, invasion of privacy – was found to present a greater risk of harm. *Id.* at 709.

Here, Local 7 seeks to present its position on the ongoing negotiations with King Soopers to King Soopers employees. It is undisputed, however, that Local 7 has many

-16-

peaceful and effective avenues via which it can present its position to King Soopers employees. Blitzing is only one of many strategies available to Local 7. On the other hand, it is clear that the blitzing incidents described by the King Soopers witnesses have caused significant disruption to King Soopers business and will continue to cause such disruptions if blitzing continues. At most, Local 7 will suffer only minor hardships if blitzing is enjoined. Contrastingly, King Soopers likely will suffer greater hardship in the form of continuing disruptions of its business if blitzing continues.

Applying the standards outlined in **Amoco**, I conclude that King Soopers has established that the balance of harms weighs decidedly in favor of King Soopers.

### 4.  Public Interest

The **Amoco** court addressed the public interest element only briefly in a footnote. **Id**. at 709 n. 18. The **Amoco** court found that the peaceful resolution of labor disputes through voluntary arbitration was in the public interest. **Id**. This outweighed Amoco's asserted public interest in drug testing and, implicitly, safety. **Id**.

In the present case, the goal of peaceful resolution of labor disputes via arbitration also is a primary consideration. "The peaceful resolution of labor disputes through voluntary arbitration constitutes the overarching concern of national labor policy." **Amoco**, 885 F.2d at 701. This policy indicates clearly that peaceful resolution of labor disputes is in the public interest. The public interest in labor peace will be served by an order enjoining blitzing, pending resolution of the underlying dispute by an arbitrator. Local 7 has not asserted a countervailing public interest. I note that a union's ability to communicate with its members and to assert publicly its position about ongoing labor negotiations is in the public interest. However, blitzing is only one of many means that Local 7 can used to serve these interests. An order enjoining blitzing

will not impair these interests in any significant way.

### C. Bond

Under FED. R. CIV. P. 65, a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." In the present case, I find that a bond in the amount of one thousand dollars is sufficient to serve this purpose.

### V.  CONCLUSION & ORDERS

Based on the foregoing findings of fact and conclusions of law and to preserve the status quo in aid or arbitration, or to eschew the frustration of arbitration, I find and conclude that a preliminary injunction should enter.

**THEREFORE, IT IS ORDERED** as follows:

1. That under FED. R. CIV. P. 65, the plaintiff's **Motion for Temporary Restraining Order and Preliminary and Permanent Injunction** [#3] filed June 11, 2009, is **GRANTED IN PART**;

2. That the plaintiff's **Motion for Temporary Restraining Order and Preliminary and Permanent Injunction** [#3] filed June 11, 2009, is **GRANTED** to the extent the plaintiff seeks a preliminary injunction, but limited to the specific terms stated in this order;

3. That pending further order of court, defendant, United Food and Commercial Workers Union Local No. 7 and its union representatives **ARE ENJOINED AND RESTRAINED** from authorizing, encouraging, or performing any of the following actions:

   a) having more than two union representatives in any King Soopers store for

-18-

union purposes at the same time;

b) engaging or attempting to engage any employee of King Soopers in a discussion on the sales floor or in any work area of any King Soopers store for more than four (4) minutes;

c) engaging or attempting to engage any employee of King Soopers in a discussion while that employee is on duty and customers request or require assistance from the employee;

d) engaging or attempting to engage in any discussion concerning union business with any customer of King Soopers while on the sales floor or in any work area or in the parking lot of any King Soopers store;

e) obstructing access by customers or employees of King Soopers to any portion of a King Soopers store;

f) shouting or yelling while on the sales floor or in any work area or in the parking lot of any King Soopers store;

4. That these orders **SHALL APPLY** to defendants, including the defendant, United Food and Commercial Workers Union Local No. 7, and to the defendants' representatives, agents, servants, employees, independent contractors, consultants, attorneys-in-fact, attorneys-in-law, and any and all persons in active concert or participation with the defendants, jointly or severally, who receive actual notice of this Preliminary Injunction by personal service or otherwise;

5. That under FED. R. CIV. P. 65(c), plaintiff, Dillon Companies, Inc. d/b/a King Soopers, Inc., **SHALL DEPOSIT** with the Clerk of the Court a bond in the amount of **One Thousand dollars** ($1,000) for the payment of such costs and damages as may be suffered by any party later found to have been wrongfully restrained;

6. That the bond **SHALL BE DEPOSITED** with the Clerk of the Court on or before Monday, June 29, 2009, at 5:00 p.m. (mountain daylight time);

7. That the plaintiff's **Motion for Temporary Restraining Order and Preliminary and Permanent Injunction** [#3] filed June 11, 2009, is **DENIED** to the extent the extent the plaintiff seeks any other relief as part of its request for a preliminary injunction;

8. That the plaintiff's **Motion for Temporary Restraining Order and Preliminary and Permanent Injunction** [#3] filed June 11, 2009, is **DENIED AS MOOT** to the extent the plaintiff seeks a temporary restraining order;

9. That the plaintiff's **Motion for Temporary Restraining Order and Preliminary and Permanent Injunction** [#3] filed June 11, 2009, is **DENIED** without prejudice to the extent the plaintiff seeks the entry of a permanent injunction.

Dated and effective June 23, 2009, at 3:15 p.m. (MDT), at Denver, Colorado.

                    **BY THE COURT:**

*Bob Blackburn*
Robert E. Blackburn
United States District Judge